UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| SHAWN TOWE, as next friend and personal representative of the Estate of Corey Towe, SHAWN TOWE in his individual capacity and as father of Corey Towe, and KAREN TOWE in her individual capacity and as mother of Corey Towe,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 3:24-cv-00184<br><br>**JURY DEMANDED** |

## COMPLAINT

Plaintiffs Shawn and Karen Towe, whose only child and son Corey Towe is deceased, bring this Complaint seeking compensation for harm caused by Cherokee Health Systems, Anicka K. Kolarik MD, Lauren Hulse, Jacqui Schollenberger, Katherine Whittington PMHNP, Cindy Perry MD, Kerri Harris, Anne Singleton, and Brittany Lucas FNP (the "Deemed Federal Employees") and seek justice for the tragic injuries and the loss of Corey's life after Cherokee Health Systems and the individual Deemed Federal Employees named herein responsible for Corey's care failed to render proper and appropriate care and treatment in accordance with the recognized standards of acceptable professional practice. As a result of that failure, Corey's mental and physical health deteriorated, he suffered significant physical pain and emotional distress, and he ultimately committed suicide on or about October 25, 2022. As an additional result of the malpractice and neglect that occurred in this case, Mr. and Mrs. Towe have suffered extreme emotional distress and suffered the loss of consortium brought about by Corey's untimely death.

1.     Plaintiffs' attorney has complied with the provisions of T.C.A. § 29-26-122 as confirmed by the attached Certificate of Good Faith, Exhibit A.

2.     Plaintiffs have complied with the provisions of T.C.A. § 29-26-121 subsection (a) by giving written notice of their claims to each Deemed Federal Employee within the one-year statute of limitations and at least 60 days prior to the filing of this Complaint. An Affidavit establishing that the specified statutory notice was timely mailed along with a copy of the notice letter and certificates of mailing are attached hereto as Exhibit B.

## THE PARTIES

3.     Plaintiff Shawn Towe, father of Corey Towe and husband of Karen Towe, is a citizen and resident of Knox County, Tennessee, and brings this Complaint as next friend and personal representative of the Estate of Corey Towe. Mr. Towe also brings this Complaint in his individual capacity as the father of Corey Towe.

4.     Plaintiff Karen Towe, mother of Corey Towe and wife of Shawn Towe, is a citizen and resident of Knox County, Tennessee, and brings this Complaint in her individual personal capacity as the mother of Corey Towe.

5.     Defendant United States of America is responsible under the Federal Tort Claims Act ("FTCA") for the acts and omissions of each of the Deemed Federal Employees named herein. The Certification of Scope of Federal Employment signed by the United States Attorney for the Eastern District of Tennessee is attached hereto as Exhibit C.[1]

---

[1] On October 23, 2023, Plaintiffs submitted an administrative claim to the U.S. Department of Health and Human Services ("HHS") in accordance with the FTCA. *See* Doc. 22-1 (Ex. 1 to Mot. to Stay) (C. Morton Oct. 23, 2023 Email) in Case No. 3:24-cv-00136-TAV-JEM. Plaintiffs contend that claim was denied by HHS by virtue of an email on February 15, 2024, in which HHS was unable to state that Cherokee Health Systems and the eight individuals in fact enjoyed FTCA coverage (it stated merely that they were "eligible" for such coverage), stated "[t]hat is all we have

2

6.     Cherokee Health Systems is a corporation that advertises itself as providing comprehensive health services, including primary care, behavioral health, dental, and pharmacy in Blount County, Knox County and Sevier County, Tennessee.  Cherokee oversaw, provided, and coordinated Corey's care from the time he was a small child until his death at age 21 in both Blount County and Knox County, Tennessee.

7.     Anicka K. Kolarik, M.D. is a primary care physician who at all times material was responsible for providing care to Corey Towe at Cherokee Health Systems. Dr. Kolarik oversaw and provided so-called "gender-affirming" cross-sex hormone therapy to Corey.

8.     Lauren Hulse is a counselor who was responsible for providing care to Corey Towe at Cherokee Health Systems. Ms. Hulse oversaw and provided counseling services to Corey.

9.     Jacqui Schollenberger is a counselor supervisor at Cherokee Health Systems who was responsible for providing care to Corey Towe. Ms. Schollenberger oversaw and participated in counseling services provided to Corey as a supervisor to Ms. Hulse and others.

---

to say about this matter," and instructed Plaintiffs to "feel free to proceed" with their plan of filing suit in state court to maintain the timeliness of their state-law claims. *See* Doc. 22-2 (Ex. 2 to Mot. to Stay) (K. Sicard Feb. 15, 2024 Email) in Case No. 3:24-cv-00136-TAV-JEM; Doc. 23 (Resp. to Mot. to Dismiss) at 2-4 in Case No. 3:24-cv-00136-TAV-JEM. Even if HHS had not denied Plaintiffs' administrative claim on February 15, 2024, the United States concedes that the six-month date by which HHS had to decide the claim passed yesterday, April 23, 2024. *See* Doc. 13 (Mem. in Supp. of Mot. to Dismiss) at 6 in Case No. 3:24-cv-00136-TAV-JEM ("the six-month time period under 28 U.S.C. § 2675(a) will pass on April 23, 2024"). Accordingly, Plaintiffs file this "separate, 'protective' action in federal court" after the six-month date for automatic exhaustion. *Bray v. Bon Secours Mercy Health, Inc.*, 97 F.4th 403, 420 (6th Cir. 2024) (Thapar, J., concurring). Plaintiffs file simultaneously herewith a motion to consolidate this action with Case No. 3:24-cv-00136-TAV-JEM. *See id.* (setting forth this procedure). This approach "allows [P]laintiffs to properly institute a new, exhausted claim against the government," while also maintaining the timeliness of their state-law claims should they need to pursue them. *Id.*; Doc. 23 (Resp. to Mot. to Dismiss) at 4-5 in Case No. 3:24-cv-00136-TAV-JEM.

10.     Katherine Whittington, PMHNP is a psychiatric-mental health nurse practitioner who was responsible for providing care to Corey Towe at Cherokee Health Systems. Ms. Whittington oversaw and provided psychiatric medical care to Corey.

11.     Cindy Perry, M.D. is a psychiatrist who was responsible for providing care to Corey Towe at Cherokee Health Systems. Dr. Perry oversaw and participated in psychiatric medical care provided to Corey as a supervisor to Ms. Whittington and others.

12.     Kerri Harris was a community health coordinator who was responsible for providing and coordinating care to Corey Towe at Cherokee Health Systems. Ms. Harris oversaw and assisted with the coordination of Corey's care at Cherokee Health Systems.

13.     Anne Singleton is a community health coordinator who was responsible for providing and coordinating care to Corey Towe at Cherokee Health Systems. Ms. Singleton oversaw and assisted with the coordination of Corey's care at Cherokee Health Systems.

14.     Brittany Lucas FNP is a family nurse practitioner who was responsible for providing care to Corey Towe as a primary care provider at Cherokee Health Systems. Ms. Lucas oversaw and participated in the primary care provided to Corey.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346.

16.     Venue is proper in this Court because actions or omissions which are the subject of this Complaint occurred in this District.

## FACTUAL OVERVIEW

17.     Corey's case is tragic. He was a patient at Cherokee Health Systems from an early age, approximately three and a half years old, when he was referred for neuro-psychological treatment due to his delayed development in communication and walking. He was diagnosed with Aspergers Syndrome, and later with Autism Spectrum Disorder, Intermittent Explosive Disorder, and Attention-Deficit Hyperactivity Disorder, combined type.

18.     Corey remained extremely vulnerable and unstable throughout his childhood and adolescence into young adulthood.  He suffered from Dissociative Disorder, Generalized Anxiety Disorder, Major Depression, Agitation, and Poor Judgment and Insight and was cared for by and lived at home with his parents.

19.     Corey's intellectual and adaptive disabilities manifested in impulsivity, inattention, hyper-fixation, and hyperactivity. He had difficulty in reasoning, problem solving, planning, abstract thinking, judgment, learning, comprehension, communication, social skills, and independence at work and home.

20.     Corey was under the care of Cherokee Health Systems from an early age until his death at the young age of only 21. Corey was assigned a primary care provider at Cherokee. Psychiatric practitioners at Cherokee were responsible for managing his medication and monitoring and treating his mental health struggles. Counselors at Cherokee were also responsible for monitoring and treating his mental health struggles through counseling and psychotherapy. Corey's overall care was coordinated by professionals at Cherokee.

21.     A primary care physician at Cherokee, Anicka K. Kolarik MD, who joined Cherokee in July 2020 after completing her residency, prescribed so-called "gender-affirming" cross-sex hormone therapy to Corey in or about May 2022, the month before his 21st birthday.

Dr. Kolarik prescribed estradiol and spironolactone. Estradiol is the most potent and abundant estrogen during a woman's reproductive years. Spironolactone blocks male sex hormone receptors, also called androgen receptors, which lowers the amount of testosterone the body makes.

22.     Dr. Kolarik prescribed this course of treatment based on what appears to be a diagnosis of gender dysphoria made by a recently licensed counselor, Lauren Hulse, in February 2022. Based on available records, Ms. Hulse's diagnosis appears to have been based on a single telephonic appointment with Corey. It appears Ms. Hulse never met Corey in person.

23.     Soon after Corey was placed on "gender-affirming" cross-sex hormones by Dr. Kolarik, he attempted suicide and was admitted to the crisis stabilization unit of a mental health hospital. Dr. Kolarik noted that she was aware of Corey's "worsening anxiety and depression" and "inpatient stay," but she proceeded with the so-called hormone therapy anyway.

24.     Just days before he died, Corey and his father spoke with a health coordinator at Cherokee Health Systems, Anne Singleton, and expressed concern with the hormone therapy Dr. Kolarik had prescribed. Mr. Towe expressed concern that Cherokee did not adequately evaluate Corey's ability to make the medical decision to take cross-sex hormones in light of his intellectual disabilities and mental health struggles. For his part, Corey expressed concern with the lack of a "support team." The health coordinator simply replied that the only support Cherokee was providing to Corey was a primary care provider, a counselor, a psychiatric medicine prescriber, and the coordinator herself.

25.     Corey and his father were not the only ones expressing concern at the lack of support and proper care from Cherokee Health Systems and its staff. Shortly after Corey and his father expressed their concern, a case manager with Corey's insurer Amerigroup, Leanne Brooks,

6

contacted Cherokee and expressed her concern as well. Call notes indicate that Ms. Brooks "said she is really worried about [Corey] and [his] wellbeing" and asked to speak to Dr. Kolarik "as soon as she is back in [the] office." It does not appear that Dr. Kolarik ever returned Ms. Brooks's call.

26.     A nurse at Cherokee Health Systems spoke with Ms. Brooks and noted that Ms. Brooks observed Corey "ha[d] a[]lot going on" with gender dysphoria, autism, ADHD, intellectual disability, and hospitalization for suicidal ideation. Ms. Brooks further expressed her view that she was "not sure [Corey] is competent enough to make this decision regarding the hormone replacement[.]" Ms. Brooks also observed Mr. Towe's concern that Corey "came in [one] time and left with female hormones." Ms. Brooks reported that Corey felt "really depressed today" and was "tearful" and "crying a[]lot." Ms. Brooks reported that Mr. Towe stated Corey "is not taking the estradiol as prescribed" in that he "doesn't take it for a few days and then will take multiple estradiol pills at one time."

27.     Dr. Kolarik did not order any changes to Corey's course of treatment in response to these cries for help and warning signs and many others. Indeed, Dr. Kolarik indicated to colleagues that she was unaware of Corey's hospitalization for suicidal ideation even though she had noted the hospitalization in her own treatment records. Corey's psychiatric practitioners, counselors, primary care provider, and health coordinator did not order changes to Corey's course of treatment either.

28.     Sadly, this lack of support and proper care took its toll on Corey, sending him into deep emotional and physical pain before ultimately causing him to take his own life. The actions and inactions of Cherokee Health Systems and its professionals proved inadequate and

7

ineffective. As a result, Corey suffered severe mental and physical injury and, tragically, death. And Mr. and Mrs. Towe have suffered extreme emotional distress and loss of consortium.

## ADDITIONAL FACTS AND ALLEGATIONS RELEVANT TO ALL CLAIMS

### A. **Corey was a highly vulnerable individual who suffered from numerous, well-documented mental health struggles from a young age.**

29.     Throughout his life, Corey faced mental health struggles, including attention deficit hyperactivity disorder ("ADHD"), autism, depression, and anxiety.

30.     Since he was a child, Corey was under the care of Cherokee Health Systems and clinicians there for serious mental health issues. Due to his intellectual and developmental disabilities, he found social interactions very difficult. He did not have many friends. He felt made fun of at school.

31.     Corey also found it difficult to interact with his parents at home. He often became angry and would engage in episodes of outburst that would include physical destruction of property. In his teenage years, Corey's parents, who were his caregivers and remained so into his adulthood, found this behavior particularly challenging as Corey grew up to be a formidable physical presence at 6 feet tall and well over 200 pounds.

32.     Shortly after he turned 16, Corey was seen at Cherokee Health Systems by a psychologist for behavioral issues, including lashing out at his parents and making suicidal comments. Corey had already been placed on Abilify, an antipsychotic medication used to treat schizophrenia, bipolar disorder, and depression. He also had been placed on Methylphenidate, a medication used to treat ADHD.

33.     Corey attended counseling sessions at Cherokee Health Systems and saw other clinicians there, including medical doctors. Corey also was placed on Hydroxyzine, an antihistamine used to treat anxiety disorders and allergic conditions.

8

34.     In connection with an October 18, 2017 visit to Cherokee Health Systems when Corey was still 16, a doctor noted Corey's "long term history of hyperactivity, impulsivity and organizational difficulties" which affected Corey's "school work and abilities in functioning day to day" and also a "long history of mood difficulty, anger, [and] aggression."

35.     The clinicians at Cherokee Health Systems noted Corey's reasoning, impulse control, judgment, and insight all as "poor."

36.     In addition to ADHD and autism, Corey was diagnosed with Intermittent Explosive Disorder, an impulse-control disorder characterized by sudden episodes of unwarranted anger.

37.     Corey also was placed on Strattera, a cognition-enhancing medication used to treat ADHD.

38.     An example of Corey's poor judgment and lack of basic understanding of facts was noted by a Cherokee Health Systems psychologist on or about June 26, 2018, two days before Corey's 17th birthday. The psychologist noted that Mr. Towe reported that Corey had stolen some jewelry from Mrs. Towe and burned the box the jewelry was in. Corey, in response, reported to the psychologist that because the box was burned, "now there is no evidence that a crime was committed."

39.     After he turned 18, Corey's mental health struggles continued. Corey continued to receive prescriptions and counseling from clinicians at Cherokee Health Systems.

40.     Corey expressed an affinity for technology and working with his hands. He excelled in shop classes. At a counseling visit at Cherokee Health Systems in February 2020, the psychologist noted Corey's intention to attend the Tennessee Colleges of Applied Technology and that Corey "reported he wants to be a diesel mechanic."

9

41.     Corey graduated from high school in June 2020, shortly before his 19th birthday.

He remained dependent on his parents for care, including food, clothing, housing, and

transportation. He lived at home. He did not have a regular job. He had never obtained a driver's

license.

**B.  Corey's mental health struggles continued into young adulthood, and he remained dependent on his parents for basic care.**

42.     A psychologist's notes from Cherokee Health Systems indicate that, on or about

August 11, 2020, Corey had a "panic attack." The notes further indicate that Corey drank alcohol

to the point of becoming "intoxicated" and "destroyed household property including a door." Mr.

Towe reported that Corey "stated that he was going to hang himself from the pool deck."

43.     The next day, on August 12, 2020, Corey and Mr. Towe met with the psychologist

and discussed these events. The psychologist noted that a "safety plan" was developed. Records

from Cherokee Health Systems contain a document titled "My Safety Plan" and dated August 12,

2020. The plan was designed for when the patient is "experiencing a crisis or hav[ing] thoughts

of harming myself or others" and includes steps to cope and agencies and professionals to call

for help. The psychologist at Cherokee Health Systems noted that she discussed with Mr. Towe

the idea of establishing an environmental safety plan where Corey "would not have access to

sharp objects or items that may be used for ligation (e.g., ropes, cords, belts, etc.)."

44.     Cherokee Health Systems and clinicians there continued to oversee Corey's care,

including his mental health care.

45.     In April 2021, when Corey was 19, his father called Cherokee Health Systems out

of "desperat[ion] and alarm[]" at Corey's "increasingly volatile behaviors," including "hateful"

and "really nasty" speech, refusal to do chores, and "beat[ing] in the walls and beat[ing] down

the doors" to the point that Mr. and Mrs. Towe were afraid of Corey. Notes from Cherokee also

indicate that Mr. Towe "found [Corey] in women's clothing recently" which was "shocking" to Mr. Towe because "this was nothing that [Corey] had expressed previously."

46.     The notes indicate that a nurse relayed this information to Katherine Whittington PMHNP, who discussed it with Cindy Perry MD and ordered that Corey be started on Depakote for "mood stabilization." Depakote is an anticonvulsant used to treat seizures and bipolar disorder. There is no indication in the notes that any other action was taken by Cherokee personnel. From the records, there was no discussion of gender identity or gender dysphoria.

47.     In August 2021, after Corey turned 20 that June, Mr. Towe called Cherokee Health Systems to "emergently" report that Corey was not doing well and was "physical with [Mrs. Towe] last night, shoved her into floor, and destroyed the bathroom after trashing several rooms in the house." Corey told his parents "he wanted to [commit] 'suicide by cop'" and dared his parents to call the police. The same day Mr. Towe made his report to Cherokee, Corey had a telephonic visit with Ms. Whittington, during which Ms. Whittington discussed his Depakote prescription and "participating [in] therapy."

48.     In September 2021, Corey had a telephonic visit with a counselor at Cherokee Health Systems, Lauren Hulse. Notes indicate that they discussed Corey's mental health history and challenges and desire to increase his independence and life skills.

C.  **Corey's mental health struggles became so acute that he was admitted to a mental health hospital for suicidal ideation.**

49.     On or about October 15, 2021, Corey was admitted to the crisis stabilization unit of a mental health facility, Helen Ross McNabb Center. Records indicate Corey had suicidal ideation "with thoughts/plan to jump off bridge." Notes from the visit indicate Corey reported "I put a knife to my neck a long, long time ago."

11

50.     Despite having been on antidepressant medication for years, and despite admitting to suicidal thoughts, Corey stated to staff "I did not know I was depressed. Are you getting that vibe from me?" and became agitated.

51.     Notes from the admission indicate Corey exhibited "some childlike behavior." Notes also indicate that Corey made "poor eye contact" was "argumentative, sarcastic, hyperactive, restless," and "anxious, irritable," and that his speech was "tangential." Corey reported that he "tears stuff up all the time."

52.     A nurse observed that Corey "[d]oes not appear to understand all questions" and that it was "[d]ifficult to assess [his] thought process."

53.     Corey reported he worked at Food City, a grocery store, "doing a little bit of everything" and lived with his parents. He stated he liked to "go on walks and rebuild engines."

54.     Corey's sexual orientation was noted as "bisexual," and his gender identity was noted as "male." There was no mention of any gender identity issues or gender dysphoria.

55.     Corey was discharged from the Helen Ross McNabb Center on or about October 18, 2021.

56.     In December 2021, Corey had another telephonic counseling visit with Ms. Hulse at Cherokee Health Systems. According to notes from the call, Corey discussed "feelings of sadness [and] guilt" when spending time with his girlfriend. The notes state Corey described "always feel[ing] this way" when dating women, but not when dating men. Corey "share[d] that he came out as gay but his family disapproves [due to] religious beliefs." Ms. Hulse noted she "validated" Corey's experience. Again, there was no mention of gender identity issues or gender dysphoria.

12

**D. Cherokee Health Systems staff first reference "gender identity" issues in relation to Corey in February 2022.**

57. Such issues first appear in notes for an intake visit with primary care provider Brittany Lucas FNP at Cherokee Health Systems on February 1, 2022. Notes state "[p]atient wants referral to specialist," "[h]as been taking estrogen supplement," and "[f]ather reports that this desire to transition has gotten stronger since COVID." The notes further indicate Corey was "advised to stop" taking the estrogen supplement and that a referral to a specialist was made. The notes do not state who the specialist was, but this was presumably a reference to Dr. Kolarik at Cherokee.

58. On or about February 3, 2022, Corey had another telephonic counseling call with Ms. Hulse at Cherokee Health Systems. Ms. Hulse noted that Corey expressed a female gender identity to his girlfriend and parents and that his girlfriend "is supportive but parents are less so [due to] faith beliefs." Consistent with the assessment of Corey's health care providers at Cherokee Health Systems over the years, Ms. Hulse noted Corey's impulse control and judgment as "poor."

**E. Cherokee Health Systems staff put Corey on cross-sex hormone therapy in May 2022 without proper assessment, diagnosis, transition plan, or support team and despite Corey's long history of mental health struggles and ongoing comorbidities.**

59. In or about May 2022, the month before Corey turned 21, Anicka K. Kolarik MD, a primary care physician at Cherokee Health Systems, prescribed estradiol and spironolactone to Corey. Records of the initial prescription are not available to Plaintiffs, but this allegation appears to be correct based on available records from June-October 2022. Dr. Kolarik appears to have prescribed these drugs to Corey as so-called "gender-affirming medical care" to make Corey's imposing male body look more like a woman's body. Estradiol is the most potent and

13

abundant estrogen during a woman's reproductive years. Spironolactone blocks male sex hormone receptors, also called androgen receptors, which lowers the amount of testosterone the body makes.

60.     Plaintiffs do not believe Dr. Kolarik adequately evaluated Corey for this so-called cross-sex hormone therapy before prescribing it. Instead, Plaintiffs believe that Dr. Kolarik prescribed the treatment after meeting with Corey only briefly.

61.     In addition to failing to properly prescribe medical treatments to Corey, Dr. Kolarik also failed to adequately monitor Corey and make necessary changes to his course of care.

62.     Further, it is not clear that Corey was ever properly diagnosed with gender dysphoria. It is not clear who made the diagnosis and under what circumstances because Cherokee Health Systems has not provided a complete copy of the records from what is believed to be the time period during which such diagnosis would have been made.

63.     Available Cherokee Health Systems records contain a letter dated July 27, 2022 from Ms. Hulse, the counselor, to Corey, which states that "[t]he diagnosis of F64.0 gender dysphoria in adult was added [to Corey's chart at Cherokee Health Systems] on 2/23/21 per assessment by this writer." However, no such assessment is in the records provided to Plaintiffs. It appears Ms. Hulse may have made a typographical error when referring to a February 23, 2021 assessment, as the telephonic call with Corey in which she noted gender identity issues for the first time was on February 3, 2022. Regardless, the February 3, 2022 phone call involved only discussion of certain issues. No "assessment" relating to "gender dysphoria" was documented on February 3, 2022, or at any other time in the records provided to the Plaintiffs.

14

64.     This apparent lack of proper assessment, diagnosis, treatment and documentation is particularly disturbing in light of Corey's long history of, and ongoing experience with, severe mental illness. For instance, records from a family medicine practice Corey visited in 2022 indicate that Corey "self injected (white) silicone caulk into both [of his] nipples" around the time he met with Ms. Hulse in early 2022, and again around the time of Dr. Kolarik's initial prescription of cross-sex hormone therapy in May 2022. However, neither Ms. Hulse nor Dr. Kolarik, nor anyone else at Cherokee Health Systems, noted these alarming events in their records. Nor did they undertake to discuss this issue with Corey or otherwise adjust his treatment in light of his evidently disturbed state of mind and diminished capacity to understand what was good for him.

**F.   <u>Shortly after starting cross-sex hormone therapy, Corey attempted suicide and was again admitted to a mental health hospital for suicidal ideation.</u>**

65.     After what appears to have been approximately two weeks on the cross-sex hormone regimen prescribed by Dr. Kolarik, Corey attempted suicide by taking 20 Hydroxyzine tablets.

66.     Approximately two weeks after the suicide attempt, on or about June 14, 2022, Corey was again admitted to the crisis stabilization unit at the Helen Ross McNabb Center.

67.     Intake notes indicate Corey had suicidal ideation at that time and reported "recent addition of hormone therapy beginning around one month ago." Corey also reported a previous diagnosis of post-traumatic stress disorder. He also reported trauma from a dog attack in his childhood.

68.     Corey was discharged from the Helen Ross McNabb Center on or about June 17, 2022.

15

**G. Despite Corey's suicidal ideation and ongoing acute mental health situation, and despite repeated red flags and warnings from Corey and others, the Deemed Federal Employees continued Corey on cross-sex hormone therapy without proper assessment, diagnosis, transition plan, or support team, which caused severe suffering and ultimately led to Corey's untimely death.**

69.     Less than a week later, on June 23, 2022, Corey had a follow-up visit with Dr. Kolarik at Cherokee Health Systems regarding the hormone therapy Dr. Kolarik had prescribed.

70.     Notes from the visit indicate Corey had been on the estradiol and spironolactone for "4-5 weeks." The notes also indicate Corey had "some worsening anxiety and depression" and "a recent inpatient stay" at the Helen Ross McNabb Center. Nevertheless, Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

71.     Records from Cherokee Health Systems indicate that on or about July 14, 2022, Mr. Towe called Cherokee and expressed his "concern and disagreement" with the hormone therapy Dr. Kolarik prescribed "due to [Corey's] diagnosis and mental illness." Mr. Towe reported the hormones were "driving [Corey] mad" and indicated Corey was "crying and sobbing." Despite these concerns and warnings, Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

72.     On or about July 15, 2022, Ms. Hulse, the counselor at Cherokee Health Systems, had a telephone call with Corey and Mr. Towe. Mr. Towe reported that Corey was continuing to have anger "episodes" and "tear up the house." Mr. Towe reported Corey "punched the refrigerator such that it left a dent." There was no indication that Ms. Hulse, Dr. Kolarik, or anyone else at Cherokee Health Systems assessed, or reassessed, Corey as a candidate for estradiol and spironolactone in light of these concerns and warnings. Instead, Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

16

73.     On or about August 9, 2022, Corey had a telephonic visit with Katherine Whittington PMHNP at Cherokee Health Systems for "medication management." Corey reported "increased anxiety[,] trouble sleeping, [and] hearing voices." Ms. Whittington noted that, during the visit, Corey reported "continu[ing] to be anxious and having racing thoughts." Corey also reported "inattention and poor focus during conversation."

74.     Ms. Whittington's notes also indicate that Corey reported certain "concerns" about the hormone therapy prescribed by Dr. Kolarik and Ms. Whittington "[e]ncouraged" Corey to discuss those concerns with Dr. Kolarik. There is no indication that Ms. Whittington relayed any concerns to Dr. Kolarik, or that Ms. Whittington otherwise took any steps to coordinate Corey's psychiatric care with the hormone therapy Dr. Kolarik had prescribed. Indeed, gender dysphoria was not even listed among Corey's diagnoses in Ms. Whittington's notes from the August 9, 2022 visit. Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

75.     On or about August 10, 2022, Corey had another telephonic counseling call with Ms. Hulse. Notes indicate that Corey was experiencing "elevated depression" and that "[patient] does report [he] would not contact a crisis number if [he] did have [suicidal ideation]." Ms. Hulse noted she spoke on the phone during this telephonic visit with Mr. Towe as well "for safety planning purposes." Ms. Hulse noted Mr. Towe "express[ed] his disagreement [with] Cherokee's provision of [hormone therapy] to [Corey], stating he believes the [hormone therapy] is contributing to [Corey's] depression and that [Corey] cannot consent to [hormone therapy] given [his] diagnoses" of numerous mental health issues.

17

76.     Despite noting that Corey reported he "would not" contact a crisis number if he had suicidal thoughts, Ms. Hulse did not note that she took any steps to notify anyone at Cherokee Health Systems, or anyone else for that matter, of this red flag.

77.     Likewise, despite noting that Mr. Towe expressed serious concerns about Dr. Kolarik's cross-sex hormone prescriptions making Corey's mental health worse, Ms. Hulse did not note that she discussed these concerns with Dr. Kolarik or anyone else at Cherokee Health Systems. Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

78.     On or about August 17, 2022, Corey had a second follow-up visit with Dr. Kolarik at Cherokee Health Systems regarding the hormone therapy Dr. Kolarik had prescribed. Dr. Kolarik's notes from the visit are sparse and fail to acknowledge the ongoing mental health struggles Corey was facing.

79.     Dr. Kolarik's failure to acknowledge Corey's struggles was despite Corey's test results from the visit indicating "[m]oderate depression." Dr. Kolarik did not appear to follow up on this issue or explore with Corey the mental health challenges he and his father had recently reported to Cherokee Health Systems.

80.     Dr. Kolarik did not note acknowledgement of the ongoing concern about the cross-sex hormones she was prescribing. Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

81.     That second follow-up visit, on August 17, 2022, would turn out to be Corey's last with Dr. Kolarik before he died.

82.     Corey's condition continued to deteriorate. Cherokee Health Systems and its staff failed to treat Corey adequately and properly. Cherokee Health Systems and its staff failed to address and reverse the decline in Corey's mental and physical health.

18

83. In connection with an August 22, 2022 telephonic medication management visit, Katherine Whittington PMHNP noted that Corey reported "increase[d] anxiety." Nevertheless, Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

84. In connection with an August 25, 2022 telephonic counseling call, Ms. Hulse noted that Corey took the call while in the car with his girlfriend, girlfriend's mother, and girlfriend's aunt. Ms. Hulse suggested to Corey that they meet in person at her office.

85. According to Ms. Hulse's notes, Corey then "bec[a]me[] confused," and "insist[ed]" he and Ms. Hulse "ha[d] met in person before" even though they never had. Ms. Hulse had only met with Corey on the phone for the year or so that she had known Corey.

86. Despite this obvious issue and indication of Corey's continually deteriorating state of mind, there is no indication that Ms. Hulse raised these issues with anyone else at Cherokee Health Systems, including Dr. Kolarik. Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

87. On or about October 4, 2022, Corey had another telephonic medication management visit with Katherine Whittington PMHNP. Ms. Whittington noted Corey reported "increased depression" despite taking medication as directed without missing doses.

88. Corey also reported "feeling that hormone therapy wears off in the afternoon" and that "this could contribute to symptoms" of depression and irritability. Corey also reported having "dreams about [him] dying."

89. Despite these very serious concerns regarding the hormone therapy Dr. Kolarik prescribed, Ms. Whittington did not appear to discuss these issues with Dr. Kolarik. Ms. Whittington noted she "[e]ncouraged" Corey to discuss his concerns with Dr. Kolarik.

19

90. On or about October 5, 2022, a community health coordinator at Cherokee Health Systems, Anne Singleton, spoke with Corey and his father on the phone. Ms. Singleton noted that Mr. Towe expressed his concern about the course of treatment Dr. Kolarik was prescribing to Corey: "[Mr. Towe] said he is concerned about the transition process going so fast, especially due to [Corey] having autism. [Mr. Towe] said he doesn't think [Cherokee] evaluated [Corey's] ability to make this decision on his own, and that Dr is only prescribing meds to make money."

91. Ms. Singleton noted that, for his part, Corey stated he was "concerned about lack of support," asking "isn't there supposed to be a support team?" Ms. Singleton noted her response was "yes," and that Corey had a primary care provider, counselor, psychiatric medicine provider, and the coordinator Ms. Singleton.

92. Ms. Singleton further noted that Mr. Towe stated "the transition is 'driving [Corey] crazy.'"

93. Ms. Singleton noted that Corey expressed a desire for more counseling.

94. Ms. Singleton did not adequately coordinate Corey's care and address these very serious concerns. Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

95. Less than a week later, on or about October 11, 2022, Leanne Brooks, a case manager with Corey's insurer Amerigroup, called Cherokee Health Systems and expressed her similar concerns about Corey's mental health situation. Ms. Brooks was particularly concerned about Corey's apparent lack of competence to consent to the course of hormone therapy Dr. Kolarik had prescribed for him. Notes from the call indicate Ms. Brooks stated that "she is really worried about [Corey] and [his] wellbeing" and asked to speak to Dr. Kolarik "as soon as she is back in [the] office." It does not appear that Dr. Kolarik ever returned Ms. Brooks' call.

96.     A nurse at Cherokee Health Systems spoke with Ms. Brooks and noted that Ms. Brooks observed Corey "ha[d] a[]lot going on" with gender dysphoria, autism, ADHD, intellectual disability, and hospitalization for suicidal ideation. Ms. Brooks further expressed her view that she was "not sure [Corey] is competent enough to make this decision regarding the hormone replacement[.]" Ms. Brooks also observed Mr. Towe's concern that Corey "came in [one] time and left with female hormones." Ms. Brooks reported that Corey felt "really depressed today" and was "tearful" and "crying a[]lot." Ms. Brooks reported that Mr. Towe stated Corey "is not taking the estradiol as prescribed" in that he "doesn't take it for a few days and then will take multiple estradiol pills at one time."

97.     Plaintiffs understand that another doctor who had seen Corey around this time for a physical checkup, Justin Jenkins DO, relayed similar concerns to Dr. Kolarik about the so-called cross-sex hormone therapy Dr. Kolarik had prescribed.

98.     Dr. Kolarik did not order any changes to Corey's course of treatment in response to these expressed concerns and obvious red flags and warning signs. Indeed, on or about October 12, 2022, Dr. Kolarik indicated to colleagues that she was unaware of Corey's hospitalization for suicidal ideation even though she had noted the hospitalization in her own treatment records in connection with the June 23, 2022 follow-up visit. Corey's psychiatric practitioners, counselors, primary care provider, and health coordinator did not order changes to Corey's course of treatment either.

99.     On or about October 17, 2022, Katherine Whittington PMHNP noted discussion with Dr. Kolarik of Corey's hospitalization after his suicide attempt in June 2022. Ms. Whittington also noted discussion with Dr. Kolarik of Corey's suicidal thoughts after that inpatient stay.

21

100.    On or about October 17, 2022, Ms. Hulse also noted discussion with Dr. Kolarik of Corey's hospitalization for suicidal ideation in June 2022. Ms. Hulse stated she "ha[d] been monitoring" Corey for suicidal ideation.

101.    Neither Dr. Kolarik, nor anyone else at Cherokee Health Systems, ordered changes to Corey's course of treatment. Dr. Kolarik continued to prescribe the estradiol and spironolactone to Corey.

102.    A few days later, on or about October 21, 2022, Ms. Singleton, the health coordinator, received a voicemail from Corey saying he needed a ride to an appointment at Cherokee Health Systems that afternoon. The appointment appears to have been scheduled with Dr. Kolarik. Ms. Singleton noted that she called Corey back and stated the appointment had been canceled "due to 'transportation'" and that Corey was unaware of the cancelation.

103.    Cherokee Health System notes from that same date show that a nurse, Kelly Hamilton RN, spoke with Corey and that "he stated he did not want the [appointment rescheduled]" and instead "wanted to switch to virtual" and keep the appointment with Dr. Kolarik for that day. Ms. Hamilton "advised [Corey] we needed this [appointment to be] in person and scheduled accordingly." The appointment was rescheduled for October 31, 2022, a date Corey sadly could not make because he died before then.

104.    In the morning of October 25, 2023 the Plaintiffs Shawn and Karen Towe found their son Corey hanging dead in his closet.

105.    According to his death certificate, Corey died at home on October 25, 2022, aged only 21. He committed suicide by hanging. A copy of the death certificate is attached hereto as Exhibit D.

106.     If Cherokee Health Systems and its staff had properly and adequately cared for Corey, he would not have suffered as he did and he would not have taken his own life. Likewise, Mr. and Mrs. Towe would not have suffered as they did. And they would still be able to love and care for Carey and have a relationship with him as their only child.

## DUTIES AND DEVIATIONS FROM THE RECONGIZED STANDARDS OF ACCEPTEABLE PROFESSIONAL PRACTICE

107.     At all times material hereto the Deemed Federal Employees, their agents, servants and employees had the duty to exercise ordinary and reasonable care in their care and treatment of patients, including Corey Towe.

108.     At all times material hereto, recognized standards of accepted practice and reasonable care required a patient's physician and healthcare providers to utilize the skill, knowledge, techniques and care required to improve and not worsen the patient's condition.

109.     At all times material hereto, recognized standards of accepted practice and reasonable care required a patient's physician and health care providers to accurately assess, evaluate, diagnose and respond to and treat the patient's complaint and medical condition and to promptly intervene and provide appropriate care or alternatively to refer to or seek timely consultation with other physicians and health care providers and to accurately document their findings and actions in the patient's medical record.

110.     The Deemed Federal Employees deviated from the recognized standards of acceptable professional practice by failing to exercise ordinary and reasonable care in their care and treatment of Corey Towe.

111.     The Deemed Federal Employees failed to exercise that degree of skill, knowledge, and technique required to improve Corey's Towe's condition, and the Deemed Federal Employees' actions and inactions and care actually worsened his condition.

23

112.     The Deemed Federal Employees deviated from the recognized standards of acceptable professional practice by negligently failing to timely recognize, intervene and diagnose the severity of Corey Towe's complaints and mental and overall condition, failing to promptly and appropriately intervene and provide appropriate care, or alternatively failing to refer to or seek timely consultation with other physicians and health care providers and further failing to appropriately record their findings and actions in Corey's medical records.

113.     As alleged herein, Cherokee Health Systems and its staff and individual health care providers named herein deviated from the recognized standards of acceptable professional practice.  They each owed a duty of care to Corey, breached that duty, and caused Corey and his parents great harm and damages as a result. They acted with less than or failed to act with ordinary and reasonable care in accordance with the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that they practice in the community in which they practice or in similar communities at the time the alleged injuries and wrongful actions occurred.

114.     Cherokee Health Systems ("Cherokee") negligently deviated from the recognized standards of acceptable professional practice by failing to render proper and adequate care to Corey, who was an extremely vulnerable individual with numerous, well-documented mental health challenges. Cherokee failed to assemble and maintain a team of providers for Corey to properly evaluate and coordinate and make themselves aware of Corey's needs, to perform complete assessments and evaluations, to accurately diagnose and order and direct appropriate treatment, and to monitor Corey's progress and make adjustments as needed.

115.     With respect to the so-called "gender-affirming" cross-sex hormone therapy in particular, Cherokee failed to perform a proper assessment or diagnosis taking into account

24

Corey's long history of mental health challenges and ongoing comorbidities, failed to formulate and implement a transition plan, and failed to provide a proper and adequate support team for Corey. Further, Cherokee failed to obtain informed consent from Corey.

116.    Upon information and belief, Dr. Kolarik had inadequate training and experience and was not qualified to prescribe cross-sex hormone therapy to Corey.

117.    Anicka K. Kolarik, M.D., negligently deviated from the recognized standards of acceptable professional practice by improperly prescribing so-called "gender-affirming" cross-sex hormone therapy to Corey without a proper assessment, evaluation or diagnosis, failing to take into account Corey's long history of mental health challenges and ongoing comorbidities, failing to develop or implement an appropriate transition plan, and failing to promptly coordinate Corey's care and provide a proper and adequate support team. When discontinuance, or at the very least adjustments to the prescriptions were obviously called for, Dr. Kolarik failed to discontinue or adjust the medications. Dr. Kolarik further deviated from the recognized standards of professional practice by failing to obtain Corey's informed consent for the hormone therapy.

118.    Lauren Hulse negligently deviated from the recognized standards of acceptable professional practice by purporting to diagnose Corey with gender dysphoria without a proper assessment and without taking into account Corey's long history of mental health challenges and ongoing comorbidities, and by failing to properly refer and coordinate Corey's care. Given her lack of training and experience, Ms. Hulse was not qualified to make such a diagnosis of Corey.

119.    Jacqui Schollenberger negligently deviated from the recognized standards of acceptable professional practice by failing to adequately supervise Ms. Hulse. Ms. Schollenberger also failed to provide proper and adequate counseling services to Corey, whom

she knew was vulnerable and in need of proper and adequate counseling. Ms. Schollenberger also failed to properly coordinate Corey's care.

120. Katherine Whittington, PMHNP negligently deviated from the recognized standards of acceptable professional practice by failing to provide proper and adequate psychiatric and nursing care to Corey. Ms. Whittington was aware, or should have been aware, of Corey's ongoing mental health struggles. With that information, Ms. Whittington should have adjusted Corey's medication regimen accordingly or made sure necessary and appropriate adjustments and coordination of care were made.

121. Cindy Perry M.D., negligently deviated from the recognized standards of acceptable professional practice by failing to provide proper and adequate medical and psychiatric care to Corey. Dr. Perry knew or should have been aware of Corey's ongoing mental health struggles. With that information, Dr. Perry should have adjusted Corey's medication regimen accordingly or made sure necessary and appropriate adjustments and coordination of care were made.

122. Kerri Harris negligently deviated from the recognized standards of acceptable professional practice by failing to provide proper and adequate coordination of care for Corey. Ms. Harris was aware, or should have been aware, of Corey's dire need for oversight, care, and intervention. With that information, Ms. Harris should have made sure Corey was receiving the oversight, care, and intervention he needed.

123. Anne Singleton negligently deviated from the recognized standards of acceptable professional practice by failing to provide proper and adequate coordination of care for Corey. Ms. Singleton was aware, or should have been aware, including in the final days of Corey's life,

26

of Corey's dire need for oversight, care, and intervention. With that information, Ms. Singleton should have made sure Corey was receiving the oversight, care, and intervention he needed.

124.    Brittany Lucas FNP, negligently deviated from the recognized standards of acceptable professional practice by failing to provide proper and adequate primary care services to Corey. Ms. Lucas was aware, or should have been aware, of Corey's dire need for proper and adequate primary care services. With that information, Ms. Lucas should have made sure Corey was receiving the primary care services he needed. Ms. Lucas also failed to properly coordinate Corey's care.

125.    As a proximate result of the Deemed Federal Employees' negligent acts or omissions, Corey Towe suffered injuries which would not otherwise have occurred.

126.    Plaintiffs bring a claim herein for wrongful death. Corey's death was caused by the wrongful act, fault, or omission of Cherokee Health Systems and its staff. Plaintiffs seek damages as a result for the mental and physical suffering, loss of time and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received. Plaintiffs also seek damages for loss of consortium. The negligent conduct of Cherokee Health Systems and its staff and the individual Deemed Federal Employees named herein other led to or made it reasonably foreseeable that Corey would commit suicide. Corey's suicide was a reasonably foreseeable probability resulting from the Deemed Federal Employees' negligent conduct and deviations from the recognized standards of acceptable professional practice.

127.    As alleged herein, Cherokee Health Systems, its staff and the individual Deemed Federal Employees named herein committed negligent infliction of emotional distress against

27

Corey Towe, Shawn Towe, and Karen Towe. They committed negligence against these individuals through their conduct alleged herein which resulted in serious and severe emotional injury where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.

128. Additionally, the Deemed Federal Employees committed negligent infliction of emotional distress against Shawn Towe and Karen Towe through (1) the actual or apparent death or serious physical injury of another caused by their negligence, (2) the existence of a close and intimate personal relationship between Mr. and Mrs. Towe and their son Corey, (3) Mr. and Mrs. Towe's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene had been materially altered, and (4) the resulting serious or severe emotional injury to Mr. and Mrs. Towe caused by the observation of the death or injury.

### COUNT ONE – CLAIM UNDER THE FEDERAL TORT CLAIMS ACT FOR NEGLIGENCE AND DEVIATIONS FROM THE RECOGNIZED STANDARDS OF ACCEPTABLE PROFESSIONAL PRACTICE

129. The preceding allegations are repeated and incorporated herein.

130. Cherokee Health Systems, Anicka K. Kolarik MD, Lauren Hulse, Jacqui Schollenberger, Katherine Whittington PMHNP, Cindy Perry MD, Kerri Harris, Anne Singleton, and Brittany Lucas FNP deviated from the recognized standards of acceptable professional practice, committed medical malpractice and negligence against Corey.

131. They owed a duty of care to Corey.

132. They breached that duty of care to Corey.

133. They caused Corey great harm and damages as a result, including death.

134. They acted with less than or failed to act with ordinary and reasonable care in accordance with the recognized standard of acceptable professional practice in the profession and

28

the specialty thereof, if any, that they practice in the community in which they practice or in a similar community at the time the alleged injury or wrongful action occurred.

135. With respect to "cross-sex" hormone therapy, they also failed to obtain informed consent from Corey. Due to his intellectual and other disabilities, Corey was incapable of giving informed consent. Further, they did not provide Corey with all of the relevant information he would have needed to make the decision to consent even if he had the capacity to give it.

136. As a proximate result of the Deemed Federal Employees' negligent acts or omissions, Corey suffered injuries which would not otherwise have occurred, including death.

## COUNT TWO – CLAIM UNDER THE FEDERAL TORT CLAIMS ACT FOR WRONGFUL DEATH

137. The preceding allegations are repeated and incorporated herein.

138. Cherokee Health Systems, Anicka K. Kolarik MD, Lauren Hulse, Jacqui Schollenberger, Katherine Whittington PMHNP, Cindy Perry MD, Kerri Harris, Anne Singleton, and Brittany Lucas FNP committed the tort of wrongful death.

139. Corey's death was caused by the wrongful act, fault, or omission of Cherokee Health Systems and its staff.

140. Plaintiffs seek damages as a result for the mental and physical suffering, loss of time and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received. Plaintiffs also seek damages for loss of consortium.

141. Corey's suicide was a reasonably foreseeable probability proximately resulting from the conduct and inaction of Cherokee Health Systems, its staff and the individual Deemed Federal Employees.

29

## COUNT THREE – CLAIM UNDER THE FEDERAL TORT CLAIMS ACT FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

142. The preceding allegations are repeated and incorporated herein.

143. Cherokee Health Systems, Anicka K. Kolarik MD, Lauren Hulse, Jacqui Schollenberger, Katherine Whittington PMHNP, Cindy Perry MD, Kerri Harris, Anne Singleton, and Brittany Lucas FNP committed negligent infliction of emotional distress against Corey and Mr. and Mrs. Towe.

144. They committed negligence against Corey and Mr. and Mrs. Towe through their conduct alleged herein which resulted in serious or severe emotional injury where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.

145. Additionally, they committed negligent infliction of emotional distress against Mr. and Mrs. Towe through (1) the actual or apparent death or serious physical injury of another caused by their negligence, (2) the existence of a close and intimate personal relationship between Mr. and Mrs. Towe and their son Corey, (3) Mr. and Mrs. Towe's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene had been materially altered, and (4) the resulting serious or severe emotional injury to Mr. and Mrs. Towe caused by the observation of the death or injury.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs Shawn Towe and Karen Towe request that this Court grant the following relief:

A.      That process be issued and served on the United States of America and that it be required to file an answer with the Court within the time prescribed by law;

B.      Adjudicate Plaintiffs' claims in their favor and against Defendant;

C.      Award Plaintiffs compensatory damages in the amount of $15,000,000.00 and other appropriate damages to which they are entitled, or which otherwise would be just in this case;

D.      Award Plaintiffs attorneys' fees and costs;

E.      Award Plaintiffs pre and post judgment interest; and

F.      Award Plaintiffs all other relief to which they may be entitled and as necessary and proper to do justice in this case.

This the 24th day of April, 2024.

Respectfully submitted,

/s/ Cathy Morton (with permission)
CATHY MORTON
Tennessee Bar No. No. 010240
**Kizer & Black, Attorneys, PLLC**
217 E. Broadway Avenue
Maryville, Tennessee 37804
Telephone: (865) 980-1602
Fax: (865) 980-6143
cmorton@kizerblack.com

/s/ Joshua Payne
JOSHUA PAYNE (*pro hac vice* application submitted herewith; admitted in Case No. 3:24-cv-00136-TAV-JEM)
Alabama Bar No. ASB-1041-A55P

31

JORDAN CAMPBELL (*pro hac vice* application forthcoming; admitted in Case No. 3:24-cv-00136-TAV-JEM)
Texas Bar No. 24087251
RONALD MILLER (*pro hac vice* application forthcoming; admitted in Case No. 3:24-cv-00136-TAV-JEM)
Texas Bar No. 24095424
DANIEL SEPULVEDA (*pro hac vice* application forthcoming; submitted in Case No. 3:24-cv-00136-TAV-JEM)
Texas Bar No. 24100910
**Campbell Miller Payne, PLLC**
5955 Alpha Rd #1491
Dallas, Texas 75240
Telephone: (214) 316-7156
josh@cmppllc.com
jordan@cmppllc.com
ron@cmppllc.com
daniel@cmppllc.com

32